IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ULTRACARE, INC., *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   CIVIL ACTION 06-0077-WS-C |
| | ) |
| TIMOTHY A. BERGERON, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

**ORDER**

This matter is before the Court on three overlapping Motions to Dismiss (docs. 14, 30 and 38) filed by defendant Roy S. Lilley; defendants Daniel A. Hollander, Gregory A. Deichmann and Carl Clark; and defendant Timothy A. Bergeron.[1]

**I.     Factual and Procedural Background.**

On February 10, 2006, plaintiffs Ultra Care, Inc. ("Ultra"), Nickey L. King and Deborah Stoudenmire filed a Complaint (doc. 1) in this District Court against defendants Timothy A. Bergeron, Roy S. Lilley, Daniel A. Hollander, Gregory A. Deichmann and Carl Clark. The Complaint posits exclusively state-law claims against defendants for breach of contract, fraud, deceit, fraudulent suppression, breach of fiduciary duty and conspiracy. As the Court understands it, the gravamen of the Complaint is that plaintiffs acquired all of defendants' stock in two Louisiana home health care companies (non-parties Ultra Home Care, Inc. and Ultra Home Services, Inc.) in July 2000, only to learn at some later date that defendants had overbilled Medicare in fiscal year 2000 to the tune of $700,000, that defendants had inflated corporate assets by $600,000 at the time of the acquisition, that defendant Clark (the Louisiana companies' Chief Financial Officer) had given false assurances about the companies' financial statements, and that most defendants had entered into business arrangements in direct competition with the

---

[1]     Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

Louisiana companies, in violation of the terms of the deal.

The Complaint does not specifically delineate the basis for federal subject matter jurisdiction; nonetheless, a fair reading reflects that plaintiffs would predicate jurisdiction on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  In this regard, the Complaint proffers the following jurisdictional allegations: (i) Ultra is an Alabama corporation organized and existing under Alabama law, with its principal place of business in Mobile, Alabama; (ii) plaintiffs King and Stoudenmire are individual citizens of Alabama; (iii) defendants are all citizens of Louisiana; and (iv) Medicare overbillings exceeded $700,000, of which defendants are contractually responsible for all but the first $100,000.[2]

In their Rule 12(b) Motions, all defendants challenged the propriety of § 1332 jurisdiction.  Defendants have no quarrel with the propositions that King and Stoudenmire are Alabama citizens, that defendants themselves are Louisiana citizens, or that the amount in controversy exceeds $75,000, exclusive of interest and costs.  However, defendants do contend that complete diversity is lacking because plaintiff Ultra, like defendants, is a citizen of Louisiana for diversity purposes.  Under § 1332, a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."  *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005) (citing 28 U.S.C. § 1332(c)(1)); *see also MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005) ("For diversity purposes, a corporation is a citizen of both the state where it is incorporated and the state where it has its principal place of business.").  It is undisputed that Ultra was incorporated in Alabama; however, defendants maintain that Ultra's principal place of business is in Louisiana, which would destroy diversity.  Following an initial round of briefing, the Court deemed the record incomplete as to the situs of Ultra's principal place of business.  Specifically, the Court noted that the affidavit of plaintiff King was vague and conclusory as to Ultra's principal place of business, that Louisiana Secretary of State records were inconclusive, and that plaintiffs' counsel had made representations in certain state-court litigation apparently admitting

---

[2] In briefing the Motions to Dismiss, plaintiffs confirmed "that the Complaint filed by Plaintiffs is based upon diversity jurisdiction pursuant to 28 U.S.C.A 1332." (Doc. 24, at 1.) There is no suggestion that any theory other than § 1332 might support federal jurisdiction over this action.

that Ultra's principal place of business was in Louisiana. To avoid confusion, and to ensure an adequate record from which the jurisdictional determination can be made, the Court entered an Order (doc. 50) on July 12, 2006 delineating nine specific factual areas as to which plaintiffs must provide supplementation, and authorizing defendants to file a rebuttal to plaintiffs' showing on these points. Plaintiffs having made the requisite supplemental filing (*see* doc. 54) and defendants having submitted a joint rebuttal (*see* docs. 55-57), the jurisdictional issue of Ultra's citizenship is now ripe for disposition.

**II.     Analysis.**

   *A.     Legal Standard for Principal Place of Business.*

It is well-settled that plaintiffs, as the parties invoking federal jursidiction, must show by a preponderance of the evidence that Ultra's principal place of business lies in a state other than Louisiana (where defendants are domiciled). *See, e.g., McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) (explaining that "party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction"); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("It is to be presumed that a cause lies outside this limited jurisdiction ... and the burden of establishing the contrary rests upon the party asserting jurisdiction."). Because "[c]itizenship for diversity purposes is determined at the time the suit is filed," *MacGinnitie*, 420 F.3d at 1239, the critical jurisdictional inquiry in this case is the location of Ultra's principal place of business as of February 10, 2006, the date on which plaintiffs initiated this action. "A district court's finding as to a corporation's principal place of business ("PPB") for purposes of establishing diversity jurisdiction ... is a question of fact and cannot be overturned unless it was clearly erroneous." *Sweet Pea*, 411 F.3d at 1247.

As mentioned *supra*, a corporation is a citizen of both the State in which it was incorporated and the State in which its principal place of business lies. To determine a corporation's principal place of business ("PPB"), the Eleventh Circuit has adopted a "total activities" test. "This analysis incorporates both the 'place of activities' test (focus on production or sales activities), and the 'nerve center' test (emphasis on the locus of the managerial and policymaking functions of the corporation)." *Sweet Pea*, 411 F.3d at 1247 (*quoting Vareka Investments, N.V. v. American Inv. Properties, Inc.*, 724 F.2d 907, 910 (11th Cir.

1984)); *see also MacGinnitie*, 420 F.3d at 1239 (explaining that "total activities" test combines "place of activities" test, which looks to location of majority of corporation's sales or production activities, and "nerve center" test, which looks to location of corporate offices).

Although it is inherently a "somewhat subjective analysis to choose between the results of the nerve center and place of activities tests, if they differ," the Eleventh Circuit has explained that "nerve-center-related" facts warrant greater weight in the PPB analysis "[w]here a company's activities are not concentrated in one place." *MacGinnitie*, 420 F.3d at 1239; *see also Sweet Pea*, 411 F.3d at 1248 (citing and following Fifth Circuit authority for proposition that "nerve center" test predominates in PPB inquiry if corporation has far-flung activities that cannot be confined to one location).[3] Stated differently, while there are no absolute, inflexible rules for balancing the "place of activities" and "nerve center" tests in the prescribed subjective analysis, courts generally emphasize the "nerve center" element when a corporation's activities are widely dispersed among different states, and generally rely on the "place of activities" factor when the corporation's executive offices are in one state and its physical operations lie wholly or predominantly in another state. *See TKI, Inc. v. Nichols Research Corp.*, 191 F. Supp.2d 1307, 1316 (M.D. Ala. 2002); *see generally J.A. Olson Co. v. City of Winona, Miss.*, 818 F.2d 401, 411 (5th Cir. 1987) (using "total activities" test and explaining general rule that "when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principal place of business" but "when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more

---

[3] In recent months, a string of unpublished district court opinions within this Circuit have extrapolated from *Sweet Pea* and *MacGinnitie* by reasoning that "if a corporation conducts the vast majority of its physical operations in a particular state, that state will contain its principal place of business; however, if a corporation's physical activities are negligible or are dispersed across several states, the nerve center, or corporate offices, will be the principal place of business." *Sherwood v. Michelin North America, Inc.*, 2006 WL 2682569, *1 (M.D. Ga. Sept. 18, 2006); *see also Werner v. Busch Entertainment Corp.*, 2006 WL 2644920, *2 (M.D. Fla. Sept. 14, 2006) (same); *Caskey-Delude v. Yosung Enterprises, Inc.*, 2006 WL 1735543, *1 (M.D. Ga. June 23, 2006) (same). These cases purport to be quoting *MacGinnitie*, even though no such language appears in this Eleventh Circuit opinion. Notwithstanding the misquote, the *Sherwood* line of authority accurately summarizes the state of the law in this Circuit concerning application of the "total activities" test where its constituent "place of activities" and "nerve center" tests diverge, as contemplated in *MacGinnitie* and *Sweet Pea*.

significant").

### B.   *Application of Standard to Ultra.*

#### 1.   *Jurisdictional Facts Pertaining to Ultra's PPB.*

The record reflects that Ultra is a home health care business that was incorporated in the State of Alabama in June 2000. (Doc. 54, at Exh. A.) As of August 2005, Ultra explains, its corporate offices were found in Covington, Louisiana. (King Aff. (doc. 24, Exh. A), ¶ 7; doc. 24, at 2; King Aff. (doc. 15, Exh. B), ¶ 3.) In the immediate aftermath of Hurricane Katrina on August 29, 2005, "[m]any corporate operations" (whose precise contours are unidentified) of Ultra were relocated to Mobile, Alabama. (Doc. 54, at ¶ b.)[4] As of February 10, 2006 (the date on which the Complaint was filed), Ultra's corporate headquarters were located in Mobile, Alabama. (*Id.* at ¶ a.) At that time, only two Ultra employees (plaintiffs King and Stoudenmire) worked at the Mobile office, which also served as headquarters for at least three other businesses operated by King and Stoudenmire. (*Id.* at ¶¶ c, d.)[5] Ultra's activities in Mobile as of February 10, 2006 consisted of holding corporate meetings, originating corporate filings, finalizing and

---

[4] Elsewhere in their supplemental submission, plaintiffs qualify even this vague statement by indicating that immediately after Hurricane Katrina, "many operations were shifted to Mobile and Columbus" (*id.* at ¶ i), presumably referring to Columbus, Georgia. As noted *infra*, Ultra was not registered to do business in Georgia, so it is unclear that its operations could lawfully have been shifted to that state. Even if the statement is accepted at face value, it serves only to undermine plaintiffs' contention that Ultra's headquarters were relocated to Mobile, Alabama after Hurricane Katrina, suggesting instead that "back-of-the-house" functions became splintered between Alabama and Georgia, with still other managerial roles (purchasing, payroll, clinical oversight, etc.) being handled primarily in Louisiana. Absent any explanation from plaintiffs as to which managerial/policymaking functions were realigned to which office post-Katrina, the Court cannot ascertain the relative importance of the Mobile office to Ultra's business.

[5] From plaintiffs' enigmatic filings, it is difficult to understand precisely what changed for Ultra after Hurricane Katrina struck. According to plaintiffs, King and Stoudenmire "have maintained their office in Mobile since 1997" and were the only persons working at Ultra's corporate headquarters in February 2006. (*Id.* at ¶¶ c, d.) But if King and Stoudenmire had always been based in Mobile, and if no other Ultra employees or officials were working in Mobile as of February 2006, it is unclear what plaintiffs mean when they assert that Ultra's corporate headquarters shifted from Covington, Louisiana to Mobile, Alabama after Hurricane Katrina. Plaintiffs have made no attempt to explain this conundrum.

approving corporate reporting, and engaging in any activity requiring board approval.  (*Id.* at ¶ e.)  The record is silent as to the frequency of any of these activities, much less whether the Mobile office was used for Ultra business on anything approaching a routine or daily basis.

But the Mobile office was not Ultra's only location as of February 10, 2006.  The company's "executive operations" were conducted in Bay Minette, Alabama.  (King Aff. (doc. 24, Exh. A), at ¶ 7.)  The Bay Minette office appears to be plaintiff King's personal residence,[6] which he uses "to facilitate control activities" by engaging in planning activities, financial planning, tax filing, accounting, forecasting, and other financial functions, as well as oversight of operations in Georgia and Louisiana.  (Doc. 54, at ¶ f.)  The record is silent as to the frequency with which the Bay Minette office was used for these purposes, whether any other Ultra employees worked there, or whether King also performed these functions at other locations.  A third Ultra office, dubbed an "operations office," was found in Covington, Louisiana, as of February 10, 2006.  (King Aff., at ¶ 7.)  The Covington office employed four people (a human resources manager, a clerk, a nursing supervisor, and a bookkeeper), and was responsible for "[a]ll local support functions for Louisiana operations."  (Doc. 54, at ¶ g.)[7]  Additional Ultra offices (mentioned by plaintiffs for the first time in these supplemental filings) are located in

---

[6] The Lac Road address listed by King as the situs of the executive operations of Ultra (*see* King Aff. (doc. 24, Exh. A.), ¶ 7) matches the residential address listed for King in the June 2006 edition of *The Real Yellow Pages* by BellSouth.

[7] Defendants express incredulity that Ultra's Covington office might be staffed by only four employees, including no nurses or other health care professionals who presumably perform the home health functions that are Ultra's "product" and the *raison d'être* for its business.  (Defendants' Rebuttal (doc. 55), at 4.)  There are several potential innocuous explanations for this result.  For example, the home health nurses who work out of the Covington office might be classified as independent contractors, rather than employees.  Or those nurses might be based exclusively out of other offices in Louisiana.  Of course, plaintiffs would have made the Court's task easier - and gone further towards satisfying their jurisdictional burden - had they come forward with evidence on this point, instead of leaving the Court and defendants to guess as to the operational and staffing arrangements of Ultra's Covington facility.  It is inconceivable that registered nurses and other health care professionals (LPNs, CNAs, etc.) do not work for Ultra in some capacity, else Ultra would surely be unable to perform the home health functions that represent its line of business.  Unfortunately, plaintiffs offer no inkling as to how many such individuals there are, where (geographically) they work, and what their relationship (*e.g.*, employees, independent contractors) with Ultra might be.

Franklin, Louisiana and Baton Rouge, Louisiana, although Ultra does not specify their activities or identify how many people work there, except to note that those offices "operate independently under the clinical oversight of Covington personnel." (*Id.*) None of plaintiffs' submissions furnish any information as to how many nurses or other health care professionals work for Ultra, much less the office or offices to which they report. As such, plaintiffs' evidence (even in this second round of briefing on the topic) remains fragmentary and incomplete as to the scope and structure of its production operations.

What is clear from Ultra's supplemental filing is that the situs of the company's managerial functions is fluid and transitory, shifting from one location to another over time. (Doc. 54, at ¶ h.) Education and compliance functions moved from Baton Rouge to Columbus, Georgia in 2005. (*Id.*) Purchasing requests and payroll generally originate in each office, then are collated in the Covington office before being shipped to Mobile or Bay Minette for final approval (whatever that may mean or entail). (*Id.*) According to Ultra, "[i]t is not possible to truthfully state that 100% of any one function occurs in any one office over a period of time." (*Id.*)

In response to a specific inquiry by this Court, Ultra states that, as of the end of 2005, some 85% of its "patients (customers)" were in Louisiana, with the other 15% being in Georgia. (Doc. 54, at ¶ h.)[8] Ultra advises that the percentage breakdown as of February 10, 2006 would "closely reflect" the end-of-2005 figures. (*Id.*) Several key points emerge on this subject. First, Ultra's evidence confirms that, at the time of filing this lawsuit, it had no customers/ patients in the State of Alabama and it was not furnishing any home health services in Alabama. Thus, while Ultra performed certain "back-of-the-house" functions from Alabama, all of its "front-of-the-house" operations were carried out in other states, with the overwhelming majority of them being performed in Louisiana. Second, Ultra's reference to customers in Georgia is confusing, and is contradicted by the record. It is quite clear that plaintiff Ultra Care, Inc., is not registered to do business in the State of Georgia. That said, a company called Ultra Care of Georgia, Inc. is

---

[8] Ultra also unhelpfully indicates that, "[a]t the end of the calendar year 2006, those percentages were 65% Louisiana and 35% Georgia." (*Id.*) The end of the 2006 calendar year remains some three months away, so the meaning of the cited 65-35 breakdown is unclear.

registered to do business in Georgia. (Defendants' Supp. Exh. C.) Georgia registration information for that entity lists plaintiff King as its CEO and CFO, and lists plaintiff Stoudenmire as its Secretary; however, nothing in those documents, or in plaintiffs' evidentiary submissions, reflects any formal affiliation or other nexus between plaintiff Ultra Care, Inc. (which cannot do business in Georgia) and the non-party called Ultra Care of Georgia, Inc. (which is registered to do business in Georgia). Simply put, plaintiffs have come forward with no evidence or explanation for why Ultra Care, Inc. should receive "credit" in the PPB analysis for the activities of Ultra Care of Georgia, Inc., or why the latter's operations have any bearing on the PPB inquiry for Ultra Care, Inc. Absent such a showing, the Court will not consider evidence that some other entity owned and/or operated by plaintiffs King and Stoudenmire may perform home health services in the State of Georgia. There is no credible evidence that plaintiff Ultra Care, Inc. performs any such services in Georgia, or that it may lawfully do so given that it is not registered to do business in that state.[9]

One other fact bears significance in the jurisdictional calculus. In August 2004, a company called Progressive Home Healthcare, Inc. filed a Louisiana state court action against Ultra and King. Paragraph 1(a) of Progressive's petition alleged as follows: "Ultra Care Inc., of Alabama, a foreign corporation who has its principal business establishment registered in the State of Louisiana at 109 North Park Blvd., Suite 320, Covington, Louisiana 70433." (Doc. 54, at Exh. C.) In its Answer dated March 10, 2006 (just one month after the inception of the instant litigation), Ultra responded that "[t]he allegations contained in paragraph 1(a) of the Petition are admitted," except that the mailing address was clarified to a different location in Covington, Louisiana. (*Id.* at Exh. B.) Thus, Ultra admitted in the Louisiana action that it was a foreign

---

[9] In an apparent attempt to advance an argument that its activities are diffuse and cover multiple states, plaintiffs' supplemental filing includes evidence that at various times prior to this litigation, Ultra acquired home health companies doing business in Mississippi and Tennessee. (Doc. 54, at ¶ i.) But plaintiffs proffer no evidence, and make no argument, that Ultra Care, Inc. was conducting any business, performing any health-care services, or handling any administrative functions in those states as of February 10, 2006, when this lawsuit was filed. It is undisputed that Ultra had no patients/customers in either Mississippi or Tennessee when this case began. As such, the evidence that at different times preceding this lawsuit Ultra may have engaged in business activities in Mississippi and Tennessee is unhelpful and irrelevant to the question of the situs of Ultra's PPB when this lawsuit commenced.

corporation whose principal business establishment was registered in Louisiana at an address in Covington, Louisiana. When directed by this Court to explain this Answer, Ultra stated as follows: "Ultra does maintain an office at the address shown in the Louisiana filing. There is no representation nor is any representation intended, that such is the domicile or principle *[sic]* place." (Doc. 54, at ¶ i.) This justification is unsatisfying. What Ultra represented to the Louisiana court was that it is a foreign corporation (*i.e.*, it was incorporated under Alabama law) and that its "principal business establishment" is registered at an address in Covington, Louisiana. The Court is at a loss as to how that response could rationally be interpreted as anything other than a representation that the Louisiana address is the company's PPB. Plaintiffs' response does little to assuage the undersigned's concerns on this point.[10]

### 2. *Ultra's PPB as of February 10, 2006.*

Considering the foregoing evidence in its entirety, the undersigned concludes that plaintiffs (who are invoking federal jurisdiction here) have not met their burden of showing that Ultra is not a citizen of Louisiana for diversity purposes. The evidence before the Court cannot reasonably be construed as supporting a finding that Ultra's PPB lies anywhere other than Louisiana. Two distinct lines of reasoning yield this result.

First, the record unambiguously establishes that the overwhelming majority of Ultra's production and sales activities take place in Louisiana. Plaintiffs admit that, as of February 2006, Ultra's customers were confined to Louisiana and Georgia, with 85% of them being found in Louisiana and just 15% in Georgia. What's more, the Georgia production activities are disqualified from the jurisdictional analysis because the uncontradicted evidence is that Ultra was not registered to do business in Georgia, and plaintiffs have failed to show any link

---

[10] The Court recognizes that there is a slight discrepancy between the name of the plaintiff in this case (Ultra Care, Inc.) and the name of the entity in the Louisiana case (Ultra Care, Inc. of Alabama). Plaintiffs' supplemental filings appear to acknowledge that these two entities are in fact one and the same, and in any event plaintiffs do not suggest that the Louisiana Answer referred to a different company than the one at issue in this case. Therefore, the Court finds that the two suits involve the same Ultra entity. This finding is buttressed by a check of the Alabama Secretary of State Inquiry System, which reveals that while there is an Alabama corporation named "Ultra Care, Inc.," there is no registered entity called "Ultra Care, Inc. of Alabama" to be found on either the active or the inactive corporation records maintained by the Alabama Secretary of State.

connecting the home health activities of some other entity (apparently "Ultra Care of Georgia, Inc.") with the named corporate plaintiff in this case for domicile purposes. Having deemed irrelevant plaintiffs' showing that some other company had Georgia customers in February 2006, the evidence is that <u>all</u> of Ultra's patients/customers were located in Louisiana. In these circumstances, *MacGinnitie* and its progeny give priority to the "place of activities" test rather than the "nerve center" test for purposes of the subjective "total activities" balancing act. That the business's nerve center (corporate and executive offices) may have been found in Alabama is not dispositive under the "total activities" test when the corporation is not engaged in "far-flung" operations, but is instead operationally confined, exclusively or substantially, to a single state. *See Sweet Pea*, 411 F.3d at 1248; *J.A. Olson*, 818 F.2d at 411 ("when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principal place of business" but "when a corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant"). Ultra is in the home health business. Given the showing that substantially all of Ultra's home health activities and home health customers were confined to Louisiana in February 2006, the Court finds that Ultra was not a "far-flung" company and that the "place of activities" test predominates for "total activities" purposes in assessing Ultra's PPB. Under a "place of activities" analysis, Ultra's PPB was plainly located in Louisiana.

Second, even if the record could support a conclusion that Ultra is a far-flung business, thereby elevating the "nerve center" touchstone in the PPB analysis, there is insufficient evidence to support a finding of a "sole nerve center" in Alabama. To be sure, Ultra has presented evidence that two of its principals (plaintiffs King and Stoudenmire) retain office space in Alabama from which certain corporate meetings and corporate filings are prepared. How often do corporate meetings occur? How often are corporate filings and corporate reportings done? How often does the board meet to approve Ultra business? With no answers to any of these questions, the Court can only guess as to the operational and practical significance of the Mobile office to Ultra's management and operations. No Ultra employees (other than King and Stoudenmire) work at that office. King and Stoudenmire oversee and direct multiple other business enterprises from that location. Although King also maintains an office in Bay Minette, Alabama, that is also his residence and is not staffed by any Ultra personnel.

A sworn statement from plaintiff King reflects that Ultra's principal place of business was in Covington, Louisiana in 2004. Plaintiffs say that changed in 2005, but they have persistently failed to offer specifics as to how it changed. At most, plaintiffs assert that "[m]any corporate operations" were transferred to Mobile after Hurricane Katrina, but they do not identify those operations or explain how they were realigned. To further confuse matters, in the same filing, plaintiffs indicate that "many operations were shifted to Mobile and Columbus" after Hurricane Katrina, while certain other operations (compilation of payroll and purchasing, clinical oversight of all offices) remained in Covington, Louisiana. Far from delineating which specific management activities were performed at which locations, Ultra explains that the company's functions are "dynamic," such that the same managerial function may be performed at different locations at different times. Indeed, Ultra allows that no managerial function is performed exclusively in any one location over any period of time. King spends as much as 8 days per month outside of Alabama, presumably performing Ultra managerial duties.[11] This series of facts demonstrates that Ultra has no sole nerve center, but rather that its managerial functions are carved up and divided amongst multiple states, with the dividing lines being fluid and ever-changing. Rather than a single nerve center, plaintiffs' evidence seems more analogous to a three-headed hydra of a managerial hub.

In short, the evidence presented by Ultra conjures precisely the inverse of the scenario addressed in *Sweet Pea*. In *Sweet Pea*, the Eleventh Circuit awarded primacy to the "nerve center" test where there was a single corporate nerve center, but widely dispersed production activities. Here, by contrast, it appears that Ultra's production activities as of February 2006 were concentrated solely in Louisiana, but that its managerial functions were scattered across three different states, with the allocation and distribution of those functions shifting with the winds. Under these facts, even a "nerve center" analysis would not prompt a ruling that Ultra's PPB is located in a state other than Louisiana, and the "nerve center" inquiry bears far less

---

[11] The record is silent as to how many of the remaining working days per month he actually spends in Alabama performing managerial functions for Ultra, as opposed to any of his various other business enterprises that he oversees from his and Stoudenmire's Mobile offices.

-11-

importance in the "total activities" test than it did in *Sweet Pea*.[12]

For both of these reasons, the Court finds that application of the "total activities" test for fixing Ultra's principal place of business reveals that plaintiffs have not met their burden of establishing that location as being outside of Louisiana. The company's "place of activities" was unambiguously concentrated in Louisiana at the commencement of this litigation, and the "nerve center" evidence is inconclusive and indeterminate, at best. After the subject inquiry mandated by Eleventh Circuit precedent, the Court is of the opinion that the "place of activities" facts deserve primacy here, and that those facts reasonably admit of only one conclusion, to-wit: That Ultra's principal place of business was in Louisiana as of February 10, 2006. Because defendants are Louisiana citizens, and because the foregoing analysis establishes that Ultra is also a Louisiana citizen for diversity purposes, plaintiffs have failed to meet their burden of establishing complete diversity of citizenship between plaintiffs and defendants. Federal subject matter jurisdiction is therefore lacking under 28 U.S.C. § 1332, and this action must be dismissed for want of federal jurisdiction.

### III.    Conclusion.

For all of the foregoing reasons, defendants' Motions to Dismiss (docs. 14, 30 and 38) are due to be, and the same hereby are, **granted**. This action is **dismissed without prejudice** for lack of federal subject matter jurisdiction.[13] A separate judgment shall enter.

---

[12]    This conclusion flows, at least in part, from the fact that the record is marred by critical gaps and fundamental imprecision (as described above) concerning which managerial and executive functions Ultra performed in each state as of February 2006. If clarified properly, facts may exist that tend to establish that the corporate's sole nerve center was in Alabama in February 2006. But it was Ultra's burden to make this showing. Despite two opportunities to shoulder this burden (including specific guidance from this Court), plaintiffs have presented cryptic, incomplete information that is inadequate to meet their obligation of proving up jurisdiction by a preponderance of the evidence. This Court must make the jurisdictional determination on the basis of the record actually submitted by the parties, rather than some hypothetical record that might have been created.

[13]    In light of this determination, the Court is without jurisdiction to reach defendants' other arguments in favor of dismissal, including specifically their contentions that plaintiffs' claims are barred by principles of res judicata/collateral estoppel and that plaintiffs' claims are precluded by the applicable limitations period.

DONE and ORDERED this 29th day of September, 2006.

s/ WILLIAM H. STEELE<br>
UNITED STATES DISTRICT JUDGE